IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

BRIAN ROTHFELDT,

    Plaintiff,
v.                                                       CASE NO. 1:14-cv-148-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

    Defendant.

_____/

## REPORT AND RECOMMENDATION

    Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Title XVI Supplemental Security Income. (Doc. 1.) The Commissioner has answered (Doc. 9) and both parties have filed briefs outlining their respective positions. (Docs.14, 17.) For the reasons discussed below, it is recommended that the Commissioner's decision be affirmed.

### I.  PROCEDURAL HISTORY

    Plaintiff protectively filed an application for supplemental security income (SSI) on September 7, 2010, alleging disability beginning January 29, 2010. (R. 55-56, 69.) Plaintiff's applications were denied initially and upon reconsideration. At Plaintiff's request, on February 13, 2013, Administrative Law Judge ("ALJ") Hart conducted a hearing during which Plaintiff testified. (R. 33-68.) On March 18, 2013, the ALJ issued a written decision finding that Plaintiff was not disabled.

    Plaintiff requested review of the ALJ's decision by the Appeals Council, which was denied on July 6, 2014. (R. 1-3.) This appeal followed.

## II. **STANDARD OF REVIEW**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be

---

[1] See 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, he is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.[11] Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[12] Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from

---

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide

---

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III. SUMMARY OF THE RECORD

#### A. Medical History

Plaintiff's medical records relate predominantly to his physical impairments. The portions of the record that are relevant to the issue on appeal may be summarized as follows.

In August of 2010, Plaintiff was admitted into the emergency room at Shands. While there, he underwent a psychiatry consult for medication management. He described himself as "drained and depressed" and reported irritability and urges to exhibit anger and frustration. He stated that he had trouble sleeping, frequent distractability, poor concentration, inability to enjoy activities, and poor energy. He reported that he frequently abused marijuana and alcohol. He further stated that he had

---

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] See id.

a history of inpatient psychiatric hospitalizations; however, the last time was over 10 years ago.  Dr. Anderson, the psychiatry consult, diagnosed Plaintiff with mood disorder, not otherwise specified, and indicated that Plaintiff should be evaluated for substance induced mood disorder, alcohol abuse, and marijuana abuse.  Dr. Anderson did not recommend medical intervention but instructed Plaintiff on the importance of attending AA and NA meetings.  (R. 325-343.)

In March of 2011, Dr. Diana Benton conducted a consultative psychological examination on Plaintiff.  Plaintiff reported that he had trouble sleeping, that he was "not really depressed, just bummed out," had an occasional irritable mood or bad temper, and had ADHD and bipolar disorder.  He reported or endorsed three of nine symptoms of inattention and eight of nine symptoms of hyperactivity-impulsivity associated with ADHD.

Plaintiff stated that he "Baker Acted" himself in 1999 or 2000 due to stress and was prescribed Paxil, Seroquel, vitamins, and Valium.  He reported that he could perform all necessary activities of daily living, including bathing, dressing, cooking, and cleaning.  He stated, however, that he was unable to manage finances and could not read or write.

Plaintiff dropped out of the sixth grade to work.  While in school, he attended ESE (Exceptional Student Education) classes.  He stated that he "[drank] occasionally...like a four pack every once in a while."  He reported previous use of marijuana and cocaine but represented that he quit using drugs twenty years ago due to the cost.

Dr. Benton found Plaintiff's thought processes logical and goal oriented and

observed no evidence of delusions or abnormal thought content, no evidence of perceptual abnormalities, and a dysthymic mood with congruent affect. She opined that Plaintiff was well oriented to person, place and time. Plaintiff's memory and concentration were intact, and he was able to perform serial sevens subtractions, mental addition of double-digit numbers, and simple multiplication by five. Dr. Benton diagnosed Plaintiff with alcohol dependence, dyssomnia, not otherwise specified, mood disorder not otherwise specified by history, cannabis abuse, ADHD not otherwise specified by history, and cocaine abuse in full-sustained remission. Dr. Benton included a notation in her report to rule out learning disorder, not otherwise specified, and borderline intellectual functioning. Dr. Benton stated that intellectual assessment may be useful and that Plaintiff could benefit from substance abuse treatment. (R. 426-430.)

Janet Humphreys, Ph,D., also completed a consultative psychological examination, in which she found that Plaintiff's memory was intact and his information was adequate. (R. 223.) Dr. Humphreys found that Plaintiff may have difficulty with complex instructions but did not say that Plaintiff would have any difficult with simple instructions. She also suggested testing in her report.

A state agency psychologist filled-out a Psychiatric Review Technique ("PRT") on November 22, 2010. The PRT revealed no restrictions in activities of daily living, mild difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. A PRT prepared in January of 2010 evidenced the same degree of limitations. (R. 410-424.)

Other than the previously discussed psychological evaluations, Plaintiff has no

history of mental health treatment or counseling.

**B.    Hearing Testimony**

At the hearing, Plaintiff testified that the last job he held was with Gator Landscaping for about six months until he quit due to pain.  He looked for other jobs but was unable to find work.  (R. 39-41.)

Plaintiff stated that he was not currently seeing any doctors or other healthcare professionals and had not seen one for four or five years.  (R. 42-45.)  He was taking ibuprofen and Tylenol for pain.  He stated that he smokes a pack to a pack-and-a-half of cigarettes a day and drinks alcohol on occasion, when he has the money.  He used marijuana previously but stopped using it many years ago because he could no longer afford it.

Plaintiff stated that he could lift five or ten pounds frequently and could sit thirty to forty-five minutes before standing.  He guessed he could stand an hour to an hour and a half without taking a break.  He said that he used a cane to help him walk before it was stolen.  (R. 46-47.)

Plaintiff testified that his hobbies include carving, whittling, working on his bike, origami, and drawing.  He is able to tend to his personal needs, such as dressing and bathing, and cooks for himself.  He grocery shops and does his laundry.  (R. 49-54.)

Upon examination by his attorney, Plaintiff stated that when he was admitted to Shands in January of 2010, he had no energy and he was hearing voices.  He testified that he suffers from anxiety and frequently has panic attacks.  He stated that he has "learning problems" and could not read or write due to being hit in the head when young.

He claimed to have bipolar disorder. (R. 60-63.)

## C.     Findings of the ALJ

The ALJ found that Plaintiff had not engaged in substantial gainful activity since September 7, 2010, the application date.  The ALJ found that Plaintiff had the following severe impairments: probable osteoarthritis of the lumbar spine, cervical spine, left hip, and left ankle.  The ALJ determined that Plaintiff's hemorrhoids, history of cellulitis, and history of chest pain complaints were non-severe impairments.  The ALJ further found that Plaintiff's medically determinable impairments of a history of alcohol dependence, dyssommia, not otherwise specified, mood disorder, not otherwise specified, cannabis abuse, in reported remission, ADHD, not otherwise specified, cocaine abuse, in full sustained remission, rule out learning disorder, not otherwise specified, and rule out borderline intellectual functioning, considered singly and in combination, did not cause more than minimal limitation in his ability to perform basic mental work activities and are non-severe.

The ALJ found that Plaintiff's impairments did not meet or equal a Listing, and with regard to his mental impairments found that Plaintiff had no restrictions in activities of daily living; mild difficulties in social functioning, no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.

The ALJ concluded that Plaintiff has the residual functional capacity to perform light work, except that he may only occasionally climb, balance, stoop, kneel, crouch, and crawl.  The ALJ found that Plaintiff must avoid concentrated exposure to the use of moving machinery and unprotected heights.  The ALJ determined that Plaintiff is

restricted to performing simple, routine, and repetitive tasks.

The ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform. Relying upon the VE the ALJ determined that representative occupations that Plaintiff could perform included ticket taker, housekeeping cleaner, and a cafeteria attendant. Accordingly, the ALJ determined that Plaintiff was not disabled through the date of her decision. (R. 18-28.)

## IV. DISCUSSION

Plaintiff's sole argument on appeal is that the ALJ erred by failing to fully and fairly develop the record regarding Plaintiff's IQ. Plaintiff argues that in the face of a recommendation by two medical experts that intellectual assessment would be useful, the ALJ had a duty to refer Plaintiff for IQ testing to determine whether Listing 12.05 applied.

It is well-settled that an ALJ has a basic obligation to fully and fairly develop the record.[21] As a hearing is non-adversarial in nature, the duty to develop the record is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.[22] In all such cases, there must be a showing of prejudice before remand is warranted for further development.[23] Prejudice has been found when the record "has evidentiary gaps which result in unfairness or 'clear

---

[21] Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981); see also Zaldivar v. Apfel, 81 F. Supp. 2d 1353, 1359 (N.D. Ga. 2000).

[22] Mason v. Barnhart, 63 Fed. Appx. 284, 2003 WL 1793283, *2 (9th Cir. 2003).

[23] Brown v. Shalala, 44 F. 3d 931, 935 (11th Cir. 1995)( "In evaluating the necessity for a remand, we are guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice.") ; Kelley v. Heckler, 761 F. 2d 1538, 1540 (11th Cir. 1985).

prejudice.'"[24] An ALJ, however, is not required to order medical evidence to have a complete record unless the record establishes that it is necessary to enable the ALJ to render his decision.[25]

Remand is not warranted because Plaintiff has failed to establish that he was prejudiced by the lack of IQ testing. Although Plaintiff argues that an IQ test would have demonstrated that he met the listing for mental retardation, Listing 12.05C, an IQ score alone does not qualify a claimant for this listing.

Under Listing 12.05, an individual is mentally retarded if they have a "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."[26] The definition of mental retardation in the DSM-IV parallels the definition in the Listing.[27] General intellectual functioning refers to an IQ of about 70 or below on various standardized intelligence tests.[28]

In addition to the diagnosis of mental retardation, Listing 12.05C requires that the

---

[24] Brown, 44 F. 3d at 935 (quoting Ware v. Schweiker, 651 F. 2d 408 (5th Cir. Unit A July 1981)).

[25] Holladay v. Bowen, 848 F. 2d 1206 (11th Cir. 1988) (concerning the ordering of a consultative examination); Kelly, 761 F. 2d at 1540 (concerning additional medical information submitted by claimant).

[26] Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997) (finding that at the very least, to be considered for disability benefits under Listing 12.05, the claimant must meet all parts of the diagnostic definition in the introductory paragraph: "(1) significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." Once these three elements have been established, the court looks to paragraphs A ,B, C, and D to assess the severity of Plaintiff's mental retardation and its impairment on plaintiff's ability to work.

[27] "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." DSM-IV at 40.

[28] DSM-IV at 42.

claimant must have "a valid verbal, performance, or full scale IQ of 60 through 70 <u>and</u> a physical or other mental impairment imposing an additional and significant work-related limitation or function."[29]   As such, IQ alone is not enough to determine mental retardation, as "[i]mpairments in adaptive functioning, rather than low IQ, are usually the presenting symptoms in individuals with Mental Retardation."[30]  While the IQ often remains stable, adaptive function can improve with training,[31] and therefore a valid IQ score is not enough to determine if someone is mentally retarded.[32]  For example, "mental retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning."[33]  Thus, in addition to a qualifying IQ score Plaintiff must also demonstrate that he possessed "a physical or other mental impairment imposing an additional and significant work-related limitation of function."

This Court addressed this issue in *Beech v. Commissioner of Social Security*, No. 1:13-cv-95-MP-GRJ, 2014 WL 4783018, at *5-6 (N.D. Fla. Sept. 24, 2014).  In *Beech*,

---

[29]  20 C.F.R. Part 404, App. 1, Subpart P, 12.05(c).

[30]  <u>DSM-IV</u> at 42.

[31]  <u>Id.</u>

[32]  "Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning."  See <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837(11th Cir. 1992) ("[A] valid IQ score need not be conclusive of mental retardation where the I.Q. score is inconsistent with the other evidence in the record on the claimant's daily activities and behavior.") (citing <u>Popp v. Heckler</u>, 779 F.2d 1497, 1499 (11th Cir. 1986)).

[33]  See <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837(11th Cir. 1992) ("[A] valid IQ score need not be conclusive of mental retardation where the I.Q. score is inconsistent with the other evidence in the record on the claimant's daily activities and behavior.")(citing <u>Popp v. Heckler</u>, 779 F.2d 1497, 1499 (11th Cir. 1986)).

the plaintiff argued that the ALJ erred by failing to order an IQ test based on the consultative psychologist's report that raised the issue of borderline intellectual functioning.  The Court noted, however, that the psychologist's report was devoid of any suggestion that the claimant had adaptive deficits with respect to clainant's capacity for understanding and memory, concentration, persistence, social interaction, and adaptation to perform work.   Because the record, there, did not evidence that the plaintiff had deficits in adaptive functioning, the Court held that the ALJ did not err by failing to order IQ testing.

This record in this case is very similar to *Beech*.  The record here similarly shows no sign of deficits in Plaintiff's adaptive functioning.   Consultative psychologist Dr. Diana Benton found that Plaintiff's judgment was normal, his insight was fair, his memory was intact, his thought processes were logical and coherent, and he could perform all of his activities of daily living by himself. Dr. Benton did not direct that an IQ test should be performed nor did she say that she was unable to evaluate Plaintiff without an IQ test. Rather, Dr. Benton merely noted at the end of her report that intellectual assessment may be useful and that Plaintiff could benefit from substance abuse treatment. Notably, she did not say that IQ testing was necessary to assess Plaintiff.

Dr. Janet Humphreys, also found that Plaintiff's memory was intact and his information was adequate.  She noted that Plaintiff may have difficulty with complex instructions but did not comment on Plaintiff's ability to follow simple instructions.  (R. 222-223.)  And, while Dr. Humphreys did suggest testing, she did not say that she was unable to evaluate Plaintiff in the absence of testing.

The non-examining state agency psychologists found no restrictions in Plaintiff's activities of daily living or concentration, persistence, and pace, and only mild impairments in social functioning.

Furthermore, Plaintiff's activities of daily living did not support a finding of deficits in adaptive functioning.  As the ALJ pointed out, Plaintiff carves, whittles, draws, takes public transportation, rides the bus or his bike to Wal-Mart, uses the phone, cooks his own meals, bathes and dresses himself, uses food stamps to buy food, does laundry, works on his bike, manages his campsite, and does origami as a hobby, all of which are activities that an individual with serious deficits in adaptive functioning could not perform.  And the ALJ noted that Plaintiff previously held a driver's license (although it was revoked at the time of the hearing), demonstrating that he was capable of passing a driver's test and capable of driving an automobile.  Additionally, although Plaintiff claimed that he is unable to read and write, he was able to spell "world" and "dog" backwards during a psychological evaluation, thus suggesting that Plaintiff's claim that he was illiterate were not credible.

In sum, Plaintiff did not present any evidence suggesting he had adaptive functioning difficulties, nor does the record reflect that Plaintiff would have met the requirements of Listing 12.05C even if additional IQ testing would have been ordered and the testing revealed a low IQ score.  The ALJ acknowledged that Plaintiff's representative requested a further consultative examination to include IQ testing but rejected this request because the record fully supported the ALJ's conclusion that Plaintiff could perform simple, routine, repetitive tasks.  And  because IQ testing would

not have impacted whether Plaintiff met a listing (in view of the evidence demonstrating Plaintiff did not have deficits in adaptive functioning) the ALJ did not err by deciding not to order IQ testing.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED.**

**IN CHAMBERS** in Gainesville, Florida, on the 30th day of July 2015.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge


### NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.